180 N.J. Super. 459 (1981)
435 A.2d 572
RESORTS INTERNATIONAL, INC., A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, ET AL., PLAINTIFFS,
v.
NJM ASSOCIATES, A NEW JERSEY LIMITED PARTNERSHIP, DOING BUSINESS AS THE NEW JERSEY MONTHLY, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Atlantic County.
Decided July 1, 1981.
*463 Mark D. Schorr for plaintiffs (Sterns, Herbert & Weinroth, attorneys).
Guliet D. Hirsch for defendants (Brener, Wallack, Rosner & Hill, attorneys).
GIBSON, J.S.C.
This is a discovery motion which requires a resolution of the conflict which sometimes arises between the factfinding role of the litigation process and the privilege in favor of confidentiality for news sources. The facts which bring this issue before the court are not in dispute and may be briefly summarized. Plaintiffs instituted a defamation action as a result of an article which appeared in the May 1979 issue of New Jersey Monthly Magazine entitled "Surrender in Atlantic City." The article concerned itself with the circumstances surrounding the attainment by plaintiff Resorts of a permanent license to operate a *464 casino in Atlantic City. Among other things, the article indicated that Resorts was a "mismanaged, unscrupulous, mobtainted company...." and that as a result of a combination of improper influence and supportive treatment by the Casino Control Commission, bordering on complicity, the license processing was a "sell out." Following the commencement of the suit, and as part of the discovery process, plaintiffs served on defendants certain interrogatories and a request for the production of documents. Although many of those interrogatories were answered and certain of the documents were produced, a significant number were not  defendants taking the position that the material was "privileged." Without relating the nature of each and every interrogatory in dispute, the main thrust of the defense position relates to those questions dealing with material obtained through "confidential sources" and those relating to the "editorial process."
Essentially, the issue raised by this motion is whether defendant magazine, being an entity engaged in and connected with the news media, has a privilege to refuse to disclose as part of this civil proceeding, the sources of its story and the editorial process which culminated in its publication. Defendants assert a number of positions in support of the view that the answer to that question should be "no." The privilege that it claims is asserted to be based on the First Amendment of the United States Constitution and the New Jersey Shield Law, N.J.S.A. 2A:84A-21. Generally, plaintiffs take the position that the First Amendment is not involved and that, although admittedly defendants are included within the protections of the New Jersey Shield Law, that protection has been "waived" in this case because of the defenses asserted, including "good faith," lack of malice, etc.
With respect to the New Jersey Shield Law, the issue raised here was specifically dealt with in the case of Beecroft v. Point Pleasant Print. & Pub. Co., 82 N.J. Super. 269 (Law Div. 1964). That case also involved a libel action where the defendant newspaper resisted plaintiff's efforts at discovery. Relying *465 heavily on the Supreme Court case of Brogan v. Passaic Daily News, 22 N.J. 139 (1956), the court held that although the Shield Law would normally protect defendant from being compelled to supply the information requested, the pleading of such defenses as fair comment, good faith and reasonable belief as to the truth of the subject matter constituted a waiver of the statutory privilege, and accordingly the defendant was required to answer the interrogatories. One of the underlying theories of Beecroft and Brogan was that the privilege conferred on the news media is permissive and not mandatory, and thus the newspaper, or in this case the magazine, makes a choice as to when it will or will not invoke the privilege. Accordingly, when its own actions bring into question potential liability on its part to third parties, such as plaintiff here, it should not be able to pick and choose what it will reveal and what it will not reveal with respect to the information that bears on that liability. Brogan v. Passaic Daily News, supra at 152. It was noted in Brogan that to permit a defendant in a libel case to insulate itself from an inquiry into the sources of its publication could effectively deprive the plaintiff of the ability to prove malice. Absent such a showing, a recovery of punitive damages would be foreclosed. The court was unwilling to read such an intent into the Shield Law. Ibid.
Brogan, of course, was decided eight years prior to the landmark case of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Under the present state of the law a "public figure" must prove malice not only to recover punitive damages, but to recover at all. To establish "actual malice" in the constitutional sense requires a showing that the defendant proceeded with publication with knowledge that the material was false or with reckless disregard of whether it was false or not. Ibid. The rationale of Brogan is therefore more compelling today than it was then. At stake today is not merely the establishment of facts sufficient to establish a basis for punitive damages, but rather the survival of the cause of action itself. Cf. Carey v. Hume, 492 F.2d 631, 634 (D.D.C. 1974).
*466 The conclusion that the New Jersey Shield Law is not absolute in its granting of protection to those seeking its application was underscored in the case of In re Farber, 78 N.J. 259 (1978). Although the Shield Law was examined there within the context of a criminal trial, the court made clear that when the privileges contained in the statute are confronted by certain competing demands (in that case the constitutional right in favor of compulsory process for obtaining witnesses) the privilege must yield. That case did not involve the issue of "waiver," but it does refute the proposition that defendant is entitled to any absolute privilege based on the Shield Law. See, also State v. Boiardo, 82 N.J. 446 (1980).
Defendant urges that Brogan and Beecroft are no longer good law and should not be followed. However, absent some clear rejection of Brogan by a later tribunal of equal or higher authority, this court is not free to reject its ruling. Nor is such a suggestion persuasive on the merits. Plaintiff here has admitted that it is a "public figure" for the purposes of this suit and must bear the burden that that classification carries with it. Under the circumstances, the requirement for showing malice is clear. Questions of malice are normally subjective and thus require some examination into the thought process of the person accused. Plaintiff is therefore placed in an impossible position if it cannot pursue through discovery and at the time of trial the nature of that thought process, including the material upon which the article was based. Insofar as defendant relies on confidential sources, there should be an opportunity to inquire into the sources and the information actually supplied. Plaintiff should not be required to rely on defendant's version of the information which is critical to the establishment of the cause of action.
In addition to the general propositions previously related, the courts in both Brogan and Beecroft supported their rulings in favor of disclosure based on the conclusion that the defendants had "waived" the privilege afforded to them under the Shield Law. As noted,

*467 The privilege given, like any other personal privileges, constitutional or statutory, can be waived by voluntary testimony of the person upon whom the privilege is conferred. [citations omitted] [Brogan v. Passaic Daily News, supra 22 N.J. at 152]
Defendant in Brogan took the stand and, after testifying that he obtained his information from a "reliable source," related the substance of the information he received. The court held that in view of the defenses asserted (good faith, truth and lack of malice) such conduct constituted a "waiver" and therefore an inquiry into the privileged information should have been permitted. In Beecroft, as here, the issue came before the court as part of the discovery process. The same defenses of good faith, lack of malice, etc., were asserted, and defendant again claimed that the information relied upon for the article was based on confidential sources. In ordering disclosure the court made reference to N.J.S.A. 2A:84A-29, a section of the Shield Law speaking directly to waiver. Part (b) of that statute indicates that waiver exists when the holder of the privilege "without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure made by anyone." Beecroft did not rely on this provision, however, but rather ruled that the asserting of the defenses listed above, "while conceivably not within the scope of a waiver as defined by N.J.S.A. 2A:84A-29(b), can nevertheless be viewed as an act constituting an effective waiver...." Beecroft v. Point Pleasant, Print. & Pub. Co., supra 82 N.J. Super. at 279. In so concluding, the court reasoned that, although the Legislation set forth only two instances of statutory waiver, waiver could also occur just as effectively from other acts. Ibid.; see also, Evid.R. 37 (Anno. 1980), comment at 182. Cf. In re Bridge, 120 N.J. Super. 460 (App.Div. 1972), certif. den. 62 N.J. 80 (1972), cert. den. 410 U.S. 991, 93 S.Ct. 1500, 36 L.Ed.2d 189 (1973).
Although neither Beecroft nor Brogan so ruled, one could argue that, since defendant has identified portions of the article as being based on confidential sources and has given "testimony" to this effect by certifying answers to interrogatories to be *468 true, a statutory waiver has occurred. N.J.S.A. 2A:84A-29. Such a reading would probably mean that every defendant in a libel suit who claims to have relied on confidential sources would waive the protections of the Shield Law. No case appears to have gone that far, nor need this court do so. The rationale of Brogan and Beecroft provides ample authority for a finding of waiver here. The fact that the issue is being examined at the discovery stage as opposed to a trial setting does not alter the controlling principles. See Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).
Further support for the conclusion that defendants are required to disclose their sources in this setting may be found in the recent amendments to the New Jersey Shield Law, L. 1979, c. 479, § 1 et seq. (eff. Feb. 27, 1980). In an apparent response to the Farber decision, the amended sections deal with procedures applicable when there is a claim and exercise of a newspaper person's privilege where the claimant is responding to a subpoena issued by or on behalf of a defendant in a criminal proceeding. N.J.S.A. 2A:84A-21.1 et seq. After a prima facie showing that the person asserting the privilege is engaged in or connected with the news media, etc., the statute requires the defendant to show by clear and convincing evidence that the privilege has been waived under N.J.S.A. 2A:84A-29 (R. 37) or that by a preponderance of the evidence
... there is a reasonable probability that the subpenaed materials are relevant, material and necessary to the defense, that they could not be secured from any less intrusive source, that the value of the material sought as it bears upon the issues of guilt or innocence outweighs the privilege against disclosure, and that the request is not overbroad, oppressive, or unreasonably burdensome which may be overcome by evidence that all or part of the information sought is irrelevant, immaterial, unnecessary to the defense, or that it can be secured from another source. Publication shall constitute a waiver only as to the specific materials published. [N.J.S.A. 2A:84A-21.3]
The above provisions are very similar to those required by the various federal cases recognizing a privilege under the First Amendment label. See discussion infra. The significance of the legislation at this point, however, is that it appears to relate exclusively to cases involving defendants in a criminal *469 proceeding. Indeed, defendants do not suggest otherwise. The fact that the Legislature has recently reexamined this area and has chosen not to change the procedures applicable in civil settings is significant. Under normal statutory construction the Legislature is presumed to know of the outstanding case law interpreting a particular statute. Having taken no steps to change the legislation in a way which would reject the readings given to it by Brogan and Beecroft, this court must assume that the Legislature intended to keep them intact. Beecroft v. Point Pleasant Print. & Pub. Co., supra 82 N.J. Super. at 276; State v. Burns, 159 N.J. Super. 539, 545 (App.Div. 1978); see, also, Legislative Comment to Assembly Bill 3062  L. 1979, c. 479. Nor does a broad reading of the amendments which would apply the new procedures to a civil setting seem to be a fair interpretation. This is particularly true in view of the "universal recognition" that statutory privileges, being in derogation of the common-law right to obtain information on matters directly in issue, should be strictly construed. Beecroft v. Point Pleasant Print. & Pub. Co., supra at 276; Brogan, supra.
The New Jersey Shield Law aside, defendants argue that they are protected from disclosure under the First Amendment to the United States Constitution. Cited in support of that proposition is the case of Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and a number of federal court decisions, including some from the Third Circuit. See Riley v. City of Chester, 612 F.2d 708 (3 Cir.1979); United States v. Cuthbertson, 630 F.2d 139 (3 Cir.1980); United States v. Criden, 633 F.2d 346 (3 Cir.1980). The thrust of most of the federal rulings indicates that a reporter has a First Amendment privilege which protects the identity of confidential sources, but that privilege is not absolute and must yield when outweighed by competing demands. Miller v. Transamerican Press, Inc., 621 F.2d 721, 725 (5 Cir.1980). Each case therefore requires a balancing of those demands within the factual framework presented. In a civil setting the competing interests include, on the one hand, the policy in favor of allowing the press unfettered *470 access to sources of information and, on the other, the fundamental goal of the judicial system in having unimpaired access to testimony and relevant information which is essential to a search for the truth. Cervantes v. Time, Inc., 464 F.2d 986 (8 Cir.1972), cert. den. 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). Defendants thus argue that the constitutional dimensions of the privilege require that this court deny the request for disclosure absent a finding that (1) the material sought is relevant; (2) it "goes to the heart" of the case, and (3) it cannot be obtained through less intrusive sources. See Garland v. Torre, 259 F.2d 545 (2 Cir.1958).
Plaintiffs assert that no such First Amendment freedom exists, that the issue is evidential in nature and is thus controlled by our own rules and statutes. Perhaps the simplest answer to this question is that once there has been a determination of "waiver," as there has been in this case, it makes little difference whether one relies on the Shield Law or the First Amendment for establishing the existence of the privilege. Whatever the source of the privilege, it has been waived. Cf. Anderson v. Nixon, 444 F. Supp. 1195, 1199 (D.D.C. 1978), recognizing the First Amendment privilege but ordering disclosure on the theory of waiver where the reporter was the plaintiff.
To deal with this issue on a substantive level requires a resolution of conflicting signals, not only from the federal sources themselves, but as between the state and federal decisions. For example, although the Branzburg decision is repeatedly cited as the source of the conclusion that the First Amendment provides a qualified privilege for newspersons sources, such a conclusion cannot be attributed to the majority of the court. The ruling was a 5-4 decision, or perhaps more accurately 4-1-4, Justice Powell's concurring opinion being needed to obtain a majority. The plurality specifically rejected the notion that a First Amendment privilege existed for newsmen which would justify their refusal to testify before a grand jury. Although Justice Powell's concurring opinion spoke in *471 terms of balancing "vital constitutional and societal interests on a case-by-case basis...," no such balancing was done by the plurality, and our own Supreme Court rejected such a weighing process when faced with the same claim. In re Farber, supra, 78 N.J. at 268. In so holding it similarly rejected the claim that a First Amendment privilege existed in such a setting. Ibid. Most federal court decisions read Branzburg more broadly. See, e.g., Riley v. City of Chester and United States v. Cuthbertson, both supra.
The most recent pronouncement from the New Jersey Supreme Court also lends support to a broader reading. State v. Boiardo, supra 82 N.J. at 455. The issue came before the court in Boiardo as a result of a claim of privilege by a reporter subpoenaed to testify in a criminal trial. Speaking to the conflict between the rights to a fair trial and free press, the court noted that when faced with this conflict the court must consider, "under the precise facts..., whether and in what manner a reconciliation of competing interests may be accomplished that will cause minimum interference with the rights of the parties." Ibid. Although the court relied on the recently amended Shield Law to support its conclusion, N.J.S.A. 2A:84A-21.1 et seq., it also gave recognition to the "constitutional dimension" of the problem. Id. at 456-457, n. 8. See, also, State v. Boiardo, 83 N.J. 350 (1980).
In assessing the above authorities, it is important to keep in mind the precise factual settings within which the rulings were made. Branzburg, Cuthbertson and Boiardo, for example, all involved criminal proceedings where the reporter claiming the privilege was not a party. Although the existence or nonexistence of a constitutional privilege should not depend on the nature of the judicial proceeding where it is asserted, United States v. Cuthbertson, supra at 147, the status of the reporter does have an impact on the weighing process. Where it is the reporter's own actions which are in issue, as is the case in a libel action, not only is the legitimacy of the asserted privilege *472 called into question but, as previously pointed out, the ability of the plaintiff to inquire into the nature of the source material becomes critical. See Herbert v. Lando, Miller v. Transamerican Press, Inc. and Carey v. Hume, all supra.
Having said that, however, does not mean that in every libel case discovery into confidential sources should routinely be granted. As a threshold matter, there should be an inquiry into the substance of the libel allegations. Cervantes v. Time, Inc., 464 F.2d 986, 993 (8 Cir.1972), cert. den. 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973). Satisfaction of the three-part test outlined in Garland, supra, would provide the further insulating process necessary to accommodate the competing demands that these cases present; i.e., (1) is the information relevant; (2) is there a compelling interest in the information, and (3) can it be obtained by alternative means? Miller v. Transamerican Press, Inc., supra at 726.
Assuming the existence of a constitutional dimension to the privilege and the applicability of the above three-part test, the circumstances of this case nevertheless justify disclosure. The thrust of the magazine article here charges plaintiff with being mismanaged, unscrupulous and "mob-tainted." It cannot be suggested, therefore, that the libel allegations are without substance. As to the requirement for relevance, clearly the basis upon which such charges are founded qualifies. Plaintiff has similarly shown a compelling need for the information in view of the critical bearing of such information on the question of malice. New York Times v. Sullivan, supra. As to the requirement that less intrusive sources be exhausted, it is difficult to conceive in this setting how such a search could be accomplished. The mob-connection charge goes to the heart of the libel claim. To the extent that defendants rely on confidential sources for such a conclusion, it would seem that there is no other practical way to inquire into the bona fides of such a claim. Certainly this court can take judicial notice that the "mob" is not easily identified and does not make its members readily available to examination.
*473 It is the opinion of this court, therefore, that, whether one relies on the New Jersey Shield Law or the First Amendment to the Federal Constitution, under the facts of this case defendants may not successfully resist plaintiffs' application for discovery. The protections of the Shield Law, although clearly applicable, have been waived. Assuming that the protection is constitutional in its dimension, it nevertheless must yield under the circumstances presented here.
There are two other defenses which have been asserted which still require the attention of this court. First, defendants now suggest that, since only eight of the paragraphs of its article rely on confidential sources and since those paragraphs do not contain defamatory material insofar as plaintiff is concerned, disclosure is not required. Second, it is argued that the editorial process is protected, even if confidential sources are not. Neither argument is persuasive. The particular paragraphs now claimed by defendants to be the result of material obtained through confidential sources cannot be read in isolation, but rather must be considered as part of the entire context of the article, where clearly there is more than enough to establish a prima facie case of libel. Also, although the paragraphs identified by defendants arguably do not directly libel Resorts, they are inextricably entwined in a setting that, at least by implication, ties Resorts to "mob" money and the utilization of improper influence. (The specific paragraphs in question are outlined on page 18 of defendants' initial brief.)
With respect to the "editorial process," defendants again argue that both the New Jersey Shield Law and the First Amendment insulate an inquiry into this area. The Supreme Court of the United States specifically rejected this argument within the context of a claim of privilege under the First Amendment, Herbert v. Lando, supra. Defendants argue, however, that Herbert v. Lando too narrowly construed the "editorial process" and that the Shield Law protects them in any event. This court rejects the "narrow construction" interpretation of *474 Herbert v. Lando. However, even assuming that the Supreme Court was too narrow in its views, its opinion is nevertheless controlling here. As to the Shield Law, the prior conclusions concerning waiver apply just as effectively whether one deals with the disclosure of confidential sources or the editorial process. Both bear critically on the establishment of facts needed by plaintiffs to establish defendants' malice and lack of good faith. In fact, the concept of waiver seems even more compelling when one deals with the editorial process than it does in the case of confidential sources. Such a comparison, however, is academic in view of the positions taken by this court.
In summary, it is the opinion of this court that, based on the facts here, plaintiff is entitled to inquire into the sources of the alleged libelous article, including those identified as being confidential. That inquiry may also include the "editorial process." Whatever First Amendment protections exist are outweighed by the fundamental need for unimpaired access to the information which is critical to the within cause of action and to the search for the truth. Although defendants are entitled to the protection of the New Jersey Shield Law, that protection has been waived.